## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMTAX HOLDINGS 227, LLC,<br>an Ohio limited liability company,<br><br>and<br><br>TAX CREDIT HOLDINGS III, LLC,<br>a Delaware limited liability company,<br><br>     Plaintiffs,<br><br>v.<br><br>TENANTS' DEVELOPMENT II<br>CORPORATION,<br>a Massachusetts corporation,<br>c/o Registered Agent<br>Tenant's Development Corporation<br>400 Massachusetts Avenue<br>Boston, MA 02115;<br><br>and<br><br>TENANTS DEVELOPMENT<br>CORPORATION,<br>a Massachusetts nonprofit corporation,<br>566 Columbus Avenue<br>Boston, MA 02118<br><br>     Defendants. | Civil Action No. _____ |

## <u>COMPLAINT</u>

Plaintiffs AMTAX HOLDINGS 227, LLC ("AMTAX") and TAX CREDIT HOLDINGS III, LLC ("TCH," and together with AMTAX, "Plaintiffs"), by and through their undersigned counsel, allege as follows for their Complaint against Defendants TENANTS' DEVELOPMENT II CORPORATION (the "General Partner") and TENANTS DEVELOPMENT CORPORATION (the "GP Affiliate," and together with the General Partner, "Defendants"):

## NATURE OF THE ACTION

1.      This action concerns efforts by the General Partner of a limited partnership formed in connection with the federal Low Income Housing Tax Credit ("LIHTC") program to unilaterally grant the General Partner's parent company rights to acquire the improved real property owned by the limited partnership without cause or consideration, to the material detriment of the limited partners (Plaintiffs) and the limited partnership.

2.      Upon information and belief, without informing the limited partners or obtaining their required consent, the General Partner provided its parent, the GP Affiliate, a non-profit corporation, with an unauthorized right of first refusal to purchase the scattered-site, low-income housing tax credit property from the limited partnership at a price tens of millions of dollars below its fair market value (the "Unauthorized Right of First Refusal," as further defined below).  The General Partner then affirmatively misled Plaintiffs about the existence of the Unauthorized Right of First Refusal.

3.      The General Partner not only improperly attempted to convert the partnership's property through self-dealing, but also violated statutory requirements of the federal LIHTC program, thereby jeopardizing the entire low-income housing tax credit project.  At the time the General Partner improperly granted the Unauthorized Right of First Refusal to the GP Affiliate, the property could not be sold due to restrictions imposed by the LIHTC program and for other reasons, including prohibitions on sale contained in the limited partnership agreement.

4.      After the conclusion of the initial compliance period that is applicable to properties regulated under the LIHTC program, the General Partner commenced efforts to self-trigger the Unauthorized Right of First Refusal and thereby force the partnership to sell the property to the GP Affiliate at a substantially discounted price.  By doing so, the General Partner effectively

sought to treat the Unauthorized Right of First Refusal as a unilateral option, which also is a violation of the statutory safe-harbor provisions of the LIHTC program.

5.      Further complicating the matter, without any authority from the partnership to do so, the General Partner then notified the City of Boston of the partnership's intent to sell the property to the GP Affiliate, prompting the City to seek to exercise its own option to purchase the property.

6.      However, because the General Partner was not authorized to act on behalf of the Partnership and the purported intended sale pursuant to the Unauthorized Right of First Refusal was otherwise *ultra vires* and invalid, the City's option was not triggered and is not ripe to be exercised.  The City's option can only be triggered and exercised if a duly-authorized notice of sale of the property is issued to the City by the partnership.  The purported notice the General Partner provided to the City was not duly authorized, and because AMTAX has not consented to any sale—which is required under the limited partnership agreement—there is no proposed sale that would permit the City's option to be triggered or exercised in any event.

7.      For these and other reasons stated herein, Plaintiffs bring this action to protect their rights and interests in and to the property and for other relief.  To that end, Plaintiffs seek a declaratory judgment that the Unauthorized Right of First Refusal: (a) is invalid, (b) was not validly triggered or exercised, (c) violates the safe harbor provisions of Section 42 of the Internal Revenue Code, 26 U.S.C. § 42 ("Section 42"); and (d) cannot be converted into a unilateral option as the General Partner has attempted to do in violation of Section 42.  In the alternative, Plaintiffs seek a declaratory judgment (e) that they are entitled to receive an exit tax distribution calculated as described below as part of the purchase price in the event the GP Affiliate is permitted to exercise the Unauthorized Right of First Refusal (which it should not be).  Plaintiffs also seek a

declaratory judgment (f) that the General Partner did not have authority to issue a notice to the City triggering the City's option or allowing the City to exercise its option, and thus the City's option was not triggered and is not effective under the circumstances.  In addition, to the extent the General Partner acted improperly or contrary to the authority granted to it under the limited partnership agreement or otherwise in violation of law, Plaintiffs seek to enforce their contractual right to remove the General Partner from the partnership.  In the alternative to declaratory judgment, Plaintiffs seek monetary damages, jointly and severally against the General Partner and GP Affiliate, for the losses they will suffer if the property is sold under any of the foregoing instruments, including but not limited to damages in the amount of the correct calculation of the plaintiffs' exit taxes and other amounts.

## THE PARTNERSHIP AND THE PARTIES

8.      Tenants' Development II, LP (the "Partnership") is a limited partnership formed under the laws of the Commonwealth of Massachusetts.  It is the owner of a scattered site, 185-unit LIHTC property consisting of multiple townhouses with interior apartment units and underlying real property known as South End Tenant's Housing II, located at multiple addresses in the South End neighborhood of Boston (the "Apartment Complex").

9.      On or about June 20, 2003, the partners entered into an Amended and Restated Agreement of Limited Partnership (as subsequently amended, the "Partnership Agreement").  At that time, the Partnership admitted Plaintiff AMTAX as its "Investor Limited Partner" and non-party Protech 2003-B, LLC ("Protech") as its "Special Limited Partner."

10.     The Partnership Agreement has since been amended three times.  The Third Amendment to the Partnership Agreement, effective August 18, 2011, withdrew Protech as the Special Limited Partner and admitted Plaintiff TCH as the new Special Limited Partner.

11.     A true and accurate copy of the Partnership Agreement, as amended, is attached hereto as **<u>Exhibit A</u>**.

12.     Plaintiff AMTAX is a limited liability company organized under the laws of Ohio. It owns 99.99 percent of the interests in the Partnership and is the Investor Limited Partner in the Partnership.  It provided more than $12 million in capital for the Partnership to acquire and/or rehabilitate the Apartment Complex.

13.     Plaintiff TCH is a limited liability company organized under the laws of Delaware. It owns 0.001 percent of the interests in the Partnership and is the Special Limited Partner of the Partnership.

14.     Defendant General Partner is a for-profit corporation formed under the laws of Massachusetts.  It owns 0.009 percent of the interests in the Partnership and is the general partner of the Partnership.  It is a wholly-owned subsidiary of Defendant GP Affiliate.

15.     Defendant GP Affiliate is a nonprofit corporation formed under the laws of Massachusetts.  It is not a partner in the Partnership and has no ownership interest in the Partnership.  The GP Affiliate is the parent and sole owner of the General Partner.  As the sole owner of the General Partner, the GP Affiliate possesses all knowledge of and control over the General Partner.

16.     The vast majority of the tax benefits generated by the Apartment Complex, including the low-income housing tax credits, flow through the Partnership to Plaintiffs.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1340. One of the primary issues in this case is whether the Unauthorized Right of First Refusal granted by the General Partner to the GP Affiliate, and the General Partner's efforts to convert the

Unauthorized Right of First Refusal into a unilateral option, comply with the statutory requirements and safe-harbor provisions of 26 U.S.C. § 42, a statute dealing with federal taxation.

18.     The fact that the Unauthorized Right of First Refusal does not comply with the federal statutory safe harbor will also determine, in part, whether a number of contractual provisions of the Partnership Agreement were materially breached by the General Partner in issuing it in the first place.  Because the Unauthorized Right of First Refusal does not comply with federal statutory requirements, the General Partner's conduct has jeopardized the entire project with respect to the Partnership's ownership, development, and operation of the Apartment Complex.

19.     26 U.S.C. § 42 is part of the Internal Revenue Code, and 28 U.S.C. § 1340 provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue." *See* Riseboro Cmty. P'ship Inc. v. SunAmerica Hous. Fund No. 682, 401 F. Supp. 3d 367, 372 (E.D.N.Y. 2019) (holding the court has jurisdiction under 28 U.S.C. §§ 1331 and 1340 of breach of contract and declaratory judgment claims related to a right of first refusal in a LIHTC project where interpretation of Section 42 is at issue).

20.     This Court has personal jurisdiction over Defendants because they are both corporations formed under the laws of the Commonwealth of Massachusetts, they both have their principal place of business in the Commonwealth of Massachusetts, and they both have purposefully availed themselves of the privileges of conducting business in the Commonwealth of Massachusetts by, among other acts, conducting business in connection with the Apartment Complex that has given rise to this suit.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

**A.     The Partnership Agreement Restricts the Sale of the Apartment Complex and Provides the General Partner with Its Own Fair-Market-Value Option and Right of First Refusal.**

22.     Section 7.1(B)(viii) of the Partnership Agreement prohibits the General Partner from selling the Apartment Complex unless AMTAX consents to the sale in accordance with Article III(C) of the Partnership Agreement.  Article III(C) of the Partnership Agreement, in turn, provides that the Apartment Complex can only be sold if AMTAX consents to the sale in writing:

> C.     The Partnership may . . . sell . . . or otherwise transfer . . . all or substantially all the assets of the Partnership; <u>provided</u>, <u>however</u>, that the terms of any such . . . sale . . . or other transfer . . . must receive the Consent of the Investor Limited Partner [defined in Section 13.1 of the Partnership Agreement to mean prior written consent] before such transaction shall be binding on the Partnership.[1]

23.     Section 7.4(J) of the Partnership Agreement provides that, after the initial compliance period applicable to LIHTC properties, and subject to compliance with Section 42 of the Internal Revenue Code, the General Partner shall have an option to purchase the interests of AMTAX in the Partnership for the Option Price as defined therein (the "General Partner's Option"). The Option Price is defined in such a way that it cannot be less than the fair market value of the Limited Partner's interests. By contrast, the Unauthorized Right of First Refusal could allow for a lower price, thereby negating the benefit of the bargain Plaintiffs made in the Partnership Agreement.

24.     Section 7.4(K) of the Partnership Agreement provides that the General Partner shall have a right of first refusal to purchase the Apartment Complex at fair market value in the event

---

[1] On April 16, 2020, AMTAX recorded a notice of its right under the Partnership Agreement to consent to any sale of the Apartment Complex with the Suffolk County Recorder of Deeds.

AMTAX exercises its own option under the Partnership Agreement to force an offer to sell the Apartment Complex after the initial compliance period (the "General Partner's ROFR").

25.     The General Partner's ROFR was intended to provide the General Partner with a defensive instrument by which to maintain control over the Apartment Complex after the initial compliance period in the event AMTAX wanted to divest the Apartment Complex.  The General Partner's ROFR confers a very different right from the separate General Partner's Option, which the General Partner can exercise offensively and unilaterally if certain conditions are met, regardless whether AMTAX wants to sell.  The General Partner's ROFR also is different from the Unauthorized Right of First Refusal that was purportedly granted to the GP Affiliate, insofar as the former requires the General Partner to pay fair market value, while the latter may permit the GP Affiliate to acquire the Apartment Complex at a significantly below-market price.

**B.      Defendants Unlawfully Execute the Unauthorized Right of First Refusal and then Conceal It from Plaintiffs.**

26.     Without any authorization, the General Partner purported to cause the Partnership to enter into a Right of Refusal and Purchase Option Agreement with the GP Affiliate, purportedly effective June 20, 2003, the same day AMTAX was admitted to the Partnership (the "Unauthorized Right of First Refusal").   A true and correct copy of the Unauthorized Right of First Refusal is attached hereto as **Exhibit B**.  It is signed by the same person, Mary Clinkscales, on behalf of both parties thereto.

27.     The Unauthorized Right of First Refusal purports to grant a right of first refusal to the GP Affiliate to purchase the Apartment Complex at a below-market price.  If effective, it would allow the GP Affiliate to acquire the Apartment Complex for substantially less than fair market value in the event the Partnership was willing to accept a bona fide offer to purchase the Apartment

Complex, assuming other conditions were met, thereby preventing the sale of the Apartment Complex for fair market value.

28.     The Unauthorized Right of First Refusal also purports to grant the GP Affiliate a unilateral option to purchase the Apartment Complex at a price that, at a minimum, reflects the property's fair market value.

29.     The Unauthorized Right of First Refusal is not referenced in the Partnership Agreement or in other documents that were executed and delivered to AMTAX at the time AMTAX was admitted to the Partnership.

30.     The Unauthorized Right of First Refusal is inconsistent with the General Partner's Option and the General Partner's ROFR, both of which are set forth in the Partnership Agreement.

31.     The General Partner had a duty to disclose the Unauthorized Right of First Refusal to the limited partners, including at the time it was purportedly executed in 2003.   Upon information and belief, the General Partner and the GP Affiliate deliberately failed to disclose the existence of the Unauthorized Right of First Refusal to Plaintiffs.

32.     At the time AMTAX was admitted to the Partnership, the General Partner delivered to AMTAX a partnership opinion and an opinion from tax counsel regarding who would be deemed the owner of the Apartment Complex for tax purposes upon the admission of AMTAX to the Partnership.  In connection with those opinions, the General Partner was required to disclose to issuing counsel all agreements that did or could impact ownership of the Apartment Complex prior to the June 20, 2003 closing.   Upon information and belief, the General Partner never disclosed to issuing counsel the existence of the Unauthorized Right of First Refusal.   The Unauthorized Right of First Refusal is not referenced in either the tax or partnership opinions that were delivered to AMTAX at the time AMTAX was admitted to the Partnership.

33.     The General Partner also provided a closing binder to the limited partners in connection with the June 20, 2003 closing, which purported to be a compilation of all operative documents constituting the parties' agreement.

34.     The General Partner did not include the Unauthorized Right of First Refusal in the closing binder.  The General Partner's failure to do so was an omission of material fact that misled the limited partners into believing that no such Unauthorized Right of First Refusal existed, that the documents in the closing binder were the only documents that had been executed in connection with the closing, and that AMTAX's interests in the Partnership were not encumbered by any other documents or agreements.

35.     In fact, the General Partner provided a certificate of representations, warranties, and covenants dated June 20, 2003 to AMTAX and its counsel (the "Representation Certificate") that affirmatively stated that the limited partner interests acquired by AMTAX would be "free and clear of any charge, lien or encumbrance except as specifically set forth in the Partnership Agreement." The Representation Certificate was executed on behalf of the General Partner by Mary Clinkscales, the same person who executed the Unauthorized Right of First Refusal purportedly on behalf of both the Partnership and the GP Affiliate.  A true and accurate copy of the Representation Certificate is attached hereto as **Exhibit C**.

36.     The Unauthorized Right of First Refusal is a charge and/or encumbrance on AMTAX's interests in the Partnership that was not specifically set forth in the Partnership Agreement or otherwise disclosed to Plaintiffs.

37.     Even when the partners specifically discussed the various options and rights that became effective under the terms of the Partnership Agreement at the end of the initial compliance period, the General Partner still did not disclose the Unauthorized Right of First Refusal.  Instead,

the General Partner referred only to the General Partner's Option under the Partnership Agreement, which, if exercised, would require the General Partner to pay fair market value for Plaintiffs' interests in the Partnership.

38.     Upon information and belief, the General Partner never obtained Plaintiffs' consent to the Unauthorized Right of First Refusal and never affirmatively disclosed the Unauthorized Right of First Refusal to Plaintiffs.

39.     The Unauthorized Right of First Refusal was executed without valid authorization or required consents, failed to comply with statutory requirements of the LIHTC program, constituted an anticipatory diversion of Partnership assets, materially breached the Partnership Agreement, breached the General Partner's fiduciary duties to its limited partners and the Partnership, was an unlawful charge and/or encumbrance on AMTAX's interests in the Partnership, and converted valuable rights that did not belong to the GP Affiliate without consideration.

**C.     Defendants Materially Breach the Partnership Agreement By Entering into the Unauthorized Right of First Refusal, Which Is *Ultra Vires* and Void.**

40.     The Unauthorized Right of First Refusal provides, in relevant part:

2.     <u>Grant of Right</u>.
        (a)     Owner grants to Sponsor a continuing right of refusal (the "Right of Refusal") to purchase the Property in the event Owner proposes to sell, transfer, assign, or ground lease all or substantially all Owner's interest therein. Notwithstanding anything to the contrary contained herein, the granting by the Owner of a mortgage, security interest, deed restriction, regulatory agreement, easement or other lien or encumbrance shall not constitute the disposition of an interest in the Property for purposes of this Agreement. In the event of any proposed sale to a bona fide third party purchaser (which term shall hereafter include any transfers or ground leases as aforesaid), Owner shall deliver to Sponsor written notice of the proposed sale (a "Disposition Notice"), which notice shall state the name and address of the proposed purchaser, the proposed use of the Property, the sales price, the seller financing offered, if any, and all other material terms of the proposed sale, and, if a written contract or offer has been signed by either or both parties, a copy of the same shall be delivered with the Disposition Notice. If Sponsor desires to exercise its Right of Refusal, Sponsor shall have 30 days from

its receipt of the Disposition Notice to deliver a written notice (the "Purchase Notice") to Owner stating that it intends to exercise its Right of Refusal hereunder.

        (b)      Notwithstanding the terms and conditions stated in the Disposition Notice, the following terms and conditions shall apply to any purchase by Sponsor or its nominee:

        (i)      the date for delivery of the deed shall be specified in the Purchase Notice and shall not be more than 120 days after Sponsor's receipt of the Disposition Notice; and

        (ii)      the purchase price shall be the lesser of:

        (x)      the price stated in the Disposition Notice, or

        (y)      the sum of the principal amount of outstanding indebtedness secured by the Property (other than indebtedness incurred within the 5-year period ending on the date of any sale to the Sponsor) and all federal, state and local taxes attributable to such sale.

Unauthorized Right of First Refusal ¶ 2.

41.      Section 42(i)(7) of the Internal Revenue Code creates a safe harbor under which certain eligible participants—including qualified nonprofit organizations—may hold below-market rights of first refusal that meet certain statutory requirements.

42.      The Unauthorized Right of First Refusal is *ultra vires* and void as written for a number of reasons, including but not necessarily limited to the following:

      a.      The safe-harbor provisions set forth in Section 42(i)(7) of the Internal Revenue Code permit (but do not require) a below-market right of first refusal to be held, but only by (i) tenants of the property; (ii) the resident management corporation of the property; (iii) a qualified nonprofit organization; or (iv) a government agency. The Unauthorized Right of First Refusal, by contrast, purports to grant the Unauthorized Right of First Refusal to the GP Affiliate as "Sponsor," a term that is undefined in and not authorized under the safe-harbor provisions.

      b.      The safe-harbor provisions set forth in Section 42(i)(7) permit (but do not require) a below-market right of first refusal to be held by specified parties to purchase a LIHTC property "after the close of the compliance period." The

Unauthorized Right of First Refusal, by contrast, purports to grant a continuing below-market right of first refusal to the GP Affiliate that was exercisable on June 20, 2003—some 15 years before Section 42(i)(7) allowed.

c. The safe-harbor provision set forth in Section 42(i)(7) requires a purchase price not less than all taxes attributable to the sale plus all outstanding debt secured by the property, except if the sale is to "the tenants," in which case the purchase price may exclude "indebtedness incurred within the 5-year period ending on the date of the sale to the tenants." The Unauthorized Right of First Refusal, however, provides for a purported purchase price that excludes "indebtedness incurred within the 5-year period ending on the date of the sale to the *Sponsor*," (emphasis added), even though the Unauthorized Right of First Refusal was not held by the tenants of the Apartment Complex.

d. The Unauthorized Right of First Refusal allows for a minimum purchase price below the minimum required under Section 42 and therefore violates the safe harbor.

43. The Unauthorized Right of First Refusal also is *ultra vires* and void as interpreted by Defendants. The General Partner has asserted that the GP Affiliate may exercise the Unauthorized Right of First Refusal to purchase the Apartment Complex at a below-market price even if the Partnership and its limited partners have not approved the terms of any sale and are not willing sellers of the Apartment Complex.

44. The General Partner's assertions described in the preceding paragraph are false.

45. In the alternative, if the General Partner's assertions described in paragraph 42 are true, then the General Partner materially breached the Partnership Agreement when it entered into

the Unauthorized Right of First Refusal, since the Unauthorized Right of First Refusal purports to permit a third party to purchase the Apartment Complex without AMTAX's consent.

46.     Moreover, under standard tax principles, if a party holds an affirmative right to acquire property at a below-market price, then the holder is treated as the owner of the property for tax purposes as of the date on which it holds the below-market right.  If Defendants are correct that the GP Affiliate holds such a right pursuant to the Unauthorized Right of First Refusal, and held such a right at all times since the closing of the transaction in 2003, then the General Partner jeopardized the tax status of the Partnership by entering into the Unauthorized Right of First Refusal, since it created a risk that the Internal Revenue Service would determine that the GP Affiliate was and is the owner of the Apartment Complex for tax purposes beginning at that time. Such a determination could cause the IRS to disallow or recapture the tax benefits claimed by the Partnership, which were a material and indispensable (but not the only) purpose of AMTAX's capital investment in the Partnership.  Because of this, tax counsel could not have issued the tax opinion that was delivered to AMTAX at the June 20, 2003 closing if it had known of the existence of the Unauthorized Right of First Refusal.

47.     If the GP affiliate is permitted to exercise the Unauthorized Right of First Refusal, and the IRS were to audit the Partnership, it could result in the loss of both the past and future tax benefits that were or otherwise would be generated for the benefit of the Partnership and its owners.

48.     Defendants' interpretation of the Unauthorized Right of First Refusal does not meet the requirements of the safe-harbor provisions set forth in Section 42(i)(7), and accordingly puts at risk the tax benefits the Partnership was designed, in part, to generate.

49.     Section 7.1(A) of the Partnership Agreement prohibits the General Partner from acting in violation of a law or regulation, which includes Section 42 of the Internal Revenue Code.

14

50.     Section 7.4 of the Partnership Agreement requires the General Partner to "carry out the purposes, business and objectives of the Partnership," which include qualifying for and obtaining low-income housing tax credits pursuant to Section 42 of the Internal Revenue Code.

51.     Section 7.4(C) of the Partnership Agreement requires the General Partner to take no "action which would cause . . . the recapture of any Federal Housing Tax Credit . . .."

52.     Section 7.4(D) of the Partnership Agreement requires the General Partner to take all actions required to "insure that the Partnership (and its Partners) will continue to qualify for the Housing Tax Credit" and "to avoid recapture of such credit for failure to comply with the requirements of Section 42 [of the Internal Revenue Code] . . .."

53.     Section 7.4(F) of the Partnership Agreement requires the General Partner to protect the assets of the Partnership.

54.     In addition to each of the aforementioned express contractual provisions, all contracts in Massachusetts include an implied covenant of good faith and fair dealing that prohibits the parties from doing anything that destroys or injures the right of the other party to receive the fruits of the contract.

55.     If the Unauthorized Right of First Refusal means what Defendants say it means, then by entering into it, the General Partner endangered the Partnership's right to receive the Low Income Housing Tax Credits and other tax benefits, and directly contravened the purpose, business, and objectives of the Partnership in violation of its express and implied contractual obligations under the Partnership Agreement.

56.     The General Partner materially breached each of the foregoing provisions of the Partnership Agreement.  The General Partner did so solely for its own benefit and for the benefit of the GP Affiliate.

**D.     Defendants Offer to Pay Millions of Dollars to Purchase Plaintiffs' Interests in the Partnership.**

57.     While they now claim Plaintiffs are not entitled to receive *anything* as a result of the GP Affiliate's exercise of the Unauthorized Right of First Refusal, Defendants previously offered to pay Plaintiffs millions of dollars for their limited partner interests.  Defendants further represented that if those offers were not accepted, the General Partner would assign to the GP Affiliate, and the GP Affiliate would exercise, the *General Partner's Option* under the Partnership Agreement (not the Unauthorized Right of First Refusal, which was not disclosed to Plaintiffs).

58.     The General Partner's Option required that Plaintiffs receive for their interests the greater of (a) fair market value, or (b) an amount sufficient to pay outstanding debt secured by the Apartment Complex plus any taxes that would be incurred by AMTAX as a result of the sale of its interests, provided that whichever amount was greater, it would in no event be less than the tax liability that would be incurred by AMTAX as a result of a sale of the Apartment Complex (the "Exit Tax Distribution").

59.     On or about February 28, 2017, and April 3, 2018, the General Partner sent letters to AMTAX proposing that the General Partner assign certain rights of the General Partner under Section 7.4(J) of the Partnership Agreement to the GP Affiliate and that the GP Affiliate purchase Plaintiffs' partnership interests "for an amount equal to the Exit Tax Distribution."

60.     The General Partner's February 28, 2017 letter included an attachment that calculated the Exit Tax Distribution to be $7,737,812.  The April 3, 2018 letter included an attachment that calculated the Exit Tax Distribution to be $4,172,194.  The General Partner noted in its April 3, 2018 letter that the reduced Exit Tax Distribution reflected therein was attributable to "reduced rates of taxation and other changes resulting from the recent tax reform legislation."

61.     The General Partner acknowledged in its February 28, 2017 and April 3, 2018 letters that substantial exit taxes amounting to millions of dollars would be imposed on AMTAX in the event of a sale of the Apartment Complex.

62.     Plaintiffs were under no obligation to accept and did not accept either of the offers described in the preceding paragraphs.

63.     The April 3, 2018 letter further stated that if Plaintiffs did not accept the General Partner's offer, the General Partner would "exercise the Option to purchase the Partnership Interests pursuant to Section 7.4(J) of the [Partnership] Agreement," after the compliance period ended on December 31, 2018.

64.     At the time of the General Partner's April 3, 2018 letter, the fair market value of AMTAX's partnership interests was higher than both the alternative debt-plus-taxes and Exit-Tax-Distribution prices set forth in Section 7.4(J) of the Partnership Agreement.

65.     Following receipt of the letter, the parties engaged in negotiations regarding Plaintiffs' potential exit from the Partnership but were unable to come to an agreement.  During those negotiations, Defendants never disclosed the existence of the Unauthorized Right of First Refusal, let alone that they planned to rely on that separate document—to which AMTAX is not a party—to force a sale of the Apartment Complex at a below-market price.  Rather, the only purchase right to which the General Partner referred during those negotiations was the General Partner's Option set forth in the Partnership Agreement.

**E.     AMTAX Conditionally Exercises its Option to Require the General Partner to Market the Apartment Complex.**

66.     Contrary to the representation in its April 3, 2018 letter, the General Partner did not exercise the General Partner's Option to purchase Plaintiffs' interests in the Partnership for fair market value following the end of the compliance period on December 31, 2018.  Accordingly, on

February 28, 2019, AMTAX sent a letter to the General Partner stating that AMTAX was conditionally exercising its right under Section 7.4(K) of the Partnership Agreement to require the General Partner to market the Apartment Complex.

67.     Section 7.4(K) of the Partnership Agreement provides, in relevant part, that AMTAX may require the solicitation of offers to purchase the Apartment Complex at fair market value, and if AMTAX consents to one of those offers, the Apartment Complex then can be sold:

> K.      . . . [T]he Investor Limited Partner shall have the option to force an offer to sell the . . . Apartment Complex (the "Limited Partner Option") . . .. Such offer shall be executed at Fair Market Value . . ..

68.     Section 7.4(K) further provides that the General Partner has a right of first refusal to purchase the Apartment Complex on the same terms as any offer that is received and accepted by AMTAX following AMTAX's exercise of its Limited Partner Option.

69.     In its February 28, 2019 letter, AMTAX reminded the General Partner that "[t]he buyer and the terms of any proposed sale shall remain subject in all respects to the consent of [AMTAX], as provided in the Partnership Agreement." In other words, AMTAX reminded the General Partner that AMTAX had the right to decline any third-party offers that were received and, accordingly, that the Partnership could not entertain any sale of the Apartment Complex without AMTAX's prior written consent.

70.     AMTAX sent the February 28, 2019 letter with the understanding that it was initiating a process that would result in the Partnership receiving fair market value for the Apartment Complex and each partner realizing its bargained-for percentage of net profits.  That understanding was based on the plain language of the Partnership Agreement and reinforced by the course of conduct and course of dealing between the parties, including but not limited to Defendants' continuing failure to disclose the existence of the Unauthorized Right of First Refusal.

71.     A month later, on March 27, 2019, the General Partner responded to AMTAX's February 28, 2019 letter.  The General Partner's response letter stated that the General Partner was "investigating the applicable terms and conditions under which we can move forward with a sale of the project" and would "report back to [AMTAX] soon."  Upon information and belief, the General Partner had not begun marketing the Apartment Complex at that time, notwithstanding AMTAX's prior conditional exercise of its contractual right to require the General Partner to do so.

**F.      AMTAX Becomes Aware of the Unauthorized Right of First Refusal and Rescinds its Instruction to the General Partner to Market the Apartment Complex.**

72.     On or about November 14, 2019, the General Partner caused the Partnership to enter into an Exclusive Sales Listing Agreement with Saint James RE Advisors LLC for the marketing of the Apartment Complex (the "Listing Agreement").  Just as it had failed to disclose the Unauthorized Right of First Refusal, the General Partner did not provide a copy of the Listing Agreement to Plaintiffs until it was already signed, even though the Listing Agreement required AMTAX's consent because (a) it obligated the Partnership to pay certain amounts to the broker even if the Apartment Complex did not sell, and (b) it did not constitute the Partnership's ordinary course of business.

73.     On or about December 6, 2019, nearly a month after it was signed, the General Partner sent a copy of the Listing Agreement to AMTAX.  The Listing Agreement referenced the Unauthorized Right of First Refusal, which had not previously been brought to AMTAX's attention by the General Partner.

74.     AMTAX requested a copy of the Unauthorized Right of First Refusal immediately after it discovered it was referenced in the Listing Agreement.

75.     On December 17, 2019, shortly after it received a copy of the Unauthorized Right of First Refusal, AMTAX sent a letter to the General Partner that (a) identified the many times that the General Partner had failed to inform AMTAX of the Unauthorized Right of First Refusal; (b) informed the General Partner that AMTAX would not have exercised its right under Section 7.4(K) to compel the General Partner to market the Apartment Complex had AMTAX been aware of the Unauthorized Right of First Refusal; and (c) stated that AMTAX was rescinding and revoking its conditional exercise of that right and its February 2019 notice letter.

76.     AMTAX further informed the General Partner in its December 17, 2019 letter that the General Partner "should immediately cease all marketing efforts and [that AMTAX] does not, in light of this newly discovered information, desire to sell the Apartment Complex."

77.     At the time it received AMTAX's December 17, 2019 letter, the General Partner could have rescinded the Listing Agreement.  The General Partner had not yet released marketing materials or received any offers to purchase the Apartment Complex at that time.

**G.     The General Partner Ignores AMTAX and Persists in Its Efforts to Trigger the Unauthorized Right of First Refusal in Order to Further Its Own Interests at the Expense of Plaintiffs and the Partnership.**

78.     Despite having just been instructed two days earlier to cease marketing the Apartment Complex, on December 19, 2019, the General Partner sent a letter purportedly in the name of the Partnership to the Massachusetts Department of Housing and Community Development ("DHCD") offering to sell the Apartment Complex to DHCD under Massachusetts General Laws Chapter 40T.

79.     The General Partner did not provide a copy of its December 19, 2019 letter to Plaintiffs or inform them that it was being sent at the time.

80.     A week later, on December 27, 2019, the General Partner's counsel sent a letter to AMTAX stating, among other things, that the General Partner was "not in a position to suspend

marketing efforts [of the Apartment Complex]" and that it would not cease soliciting offers for the Apartment Complex.

81.     The General Partner's statement that it was "not in a position to suspend marketing efforts [of the Apartment Complex]" was false.

82.     Contrary to the General Partner's false statement, the Listing Agreement expressly provides that the Partnership has the right to suspend the Listing Agreement.

83.     Three days later, on December 30, 2019, the General Partner sent the City a "Notice of Proposed Sale and Request for Approval of a Transfer to [the GP Affiliate]," purportedly in the name of the Partnership (the "Notice to Boston of Proposed Sale").

84.     In the Notice to Boston of Proposed Sale, the General Partner stated that the Apartment Complex was "listed with a broker for sale" and that, once an offer to purchase was received, the GP Affiliate "anticipate[d] exercising the [Unauthorized Right of First Refusal]." The Notice to Boston of Proposed Sale also acknowledged the City's option to purchase the Apartment Complex under certain circumstances pursuant to the terms of an Affordable Housing Covenant dated May 25, 2000, and recorded in the land records for the Apartment Complex ("Boston's Option").   The Notice to Boston of Proposed Sale nonetheless asked the City to "forebear from exercising" Boston's Option.

85.     The Notice to Boston of Proposed Sale failed to notify the City that the Apartment Complex could not be sold without AMTAX's consent, that AMTAX did not consent to a sale of the Apartment Complex at that time, and that AMTAX had expressly rescinded its prior request to market the Apartment Complex.

86.     The General Partner lacked authority to send the Notice to Boston of Proposed Sale. Furthermore, there was no basis to send the Notice to Boston of Proposed Sale because there was

no proposed sale of or offer to purchase the Apartment Complex.  There also was no then-present intent to sell the Apartment Complex, since AMTAX had rescinded its prior instruction to market the Apartment Complex.

87.     AMTAX's counsel sent a letter to the General Partner on December 31, 2019, addressing and rebutting the December 27, 2019 letter from the General Partner's counsel, but received no response for more than a month.

88.     During that time, and unbeknownst to Plaintiffs, the General Partner was continuing to advance its own interests at the expense of Plaintiffs and the Partnership by unilaterally acting to purportedly trigger the Unauthorized Right of First Refusal.  Among other things, this was a violation of the express representations made by the General Partner in the Representation Certificate that the General Partner would use its best efforts to protect the interests of AMTAX.

89.     On February 10, 2020, the General Partner sent a "Disposition Notice" in the name of the Partnership to the GP Affiliate asserting that the Partnership had received an offer to purchase the Apartment Complex from Community Preservation Partners, LLC ("CCP") for $51 million and informing the GP Affiliate that it had the right for the next 30 days to purchase the Apartment Complex for $17.1 million pursuant to the Unauthorized Right of First Refusal (the "Disposition Notice").  Contrary to its letters of February 28, 2017 and April 3, 2018, the General Partner's calculation of the purchase price pursuant to the Unauthorized Right of First Refusal assumed that Plaintiffs would receive no Exit Tax Distribution from the sale of the Apartment Complex.

90.     The General Partner did not provide a copy of the Disposition Notice to Plaintiffs or inform them that it was being sent to the GP Affiliate.

91.     The General Partner was not marketing the Apartment Complex to advance the interests of Plaintiffs and the Partnership—to whom it owed fiduciary duties and contractual obligations under the Representation Certificate—but solely in an effort to trigger the Unauthorized Right of First Refusal.  Indeed, the General Partner was quoted in the press at the time as stating that the marketing process was a mere formality and that the Apartment Complex would be acquired by the GP Affiliate via the Unauthorized Right of First Refusal.

92.     The letter of intent from CCP on which the General Partner based the Disposition Notice was not an enforceable offer.  Even if it were, it was not the highest bid the General Partner received for the Apartment Complex.  In fact, the Partnership was presented a substantially higher number from The Schochet Companies of $54 million.  The General Partner's indifference to the terms of the proposals presented by potential third-party purchasers confirms that its motive was not to maximize value to the Partnership or protect AMTAX's interests, but instead to serve its own interests at the expense of Plaintiffs and the Partnership.

**H.      The GP Affiliate Purports to Exercise the Unauthorized Right of First Refusal without AMTAX's Consent to a Sale of the Apartment Complex.**

93.     On or about February 11, 2020, in response to the Disposition Notice, the GP Affiliate sent a "Purchase Notice" to the Partnership purporting to exercise the Unauthorized Right of First Refusal (the "Purchase Notice").  The Purchase Notice claimed that the purchase price under the Unauthorized Right of First Refusal was equal to the amount of outstanding debt secured by the Apartment Complex—i.e., $17.1 million.  That amount is tens of millions of dollars less than the fair market value of the Apartment Complex and would prevent the Partnership and Plaintiffs from benefiting from the substantial appreciation in the value of the Apartment Complex that had occurred over time.

94.     Even if the GP Affiliate were permitted to exercise the Unauthorized Right of First Refusal, the purchase price set forth in the Purchase Notice is millions of dollars less than the price the GP Affiliate would be required to pay under the terms of the Unauthorized Right of First Refusal and under the terms of the safe-harbor provisions of Section 42 of the Internal Revenue Code.

95.     On February 13, 2020, the General Partner's counsel finally and belatedly informed AMTAX's counsel of the General Partner's surreptitious efforts to help the GP Affiliate trigger and exercise the Unauthorized Right of First Refusal.

96.     The General Partner informed AMTAX that "in response to a Disposition Notice . . . [the GP Affiliate] has exercised its rights under the [Unauthorized Right of First Refusal]." The General Partner's February 13, 2020 letter also enclosed—for the first time—copies of the previously withheld marketing materials, the letter to DHCD, the Notice to Boston of Proposed Sale, correspondence from prospective third-party purchasers, the Disposition Notice, and the Purchase Notice.

97.     The General Partner never obtained AMTAX's consent to a sale of the Apartment Complex to CCP or any other prospective purchaser.  On the contrary, AMTAX had expressly informed the General Partner that it did *not* consent to any such sale and had expressly rescinded its prior conditional instruction to market the Apartment Complex.

98.     As explained herein, the Unauthorized Right of First Refusal is void and ineffective, but even if it were effective, it was never validly triggered or exercised.

99.     A condition precedent to the triggering and exercise of the Unauthorized Right of First Refusal is a "proposed sale by" the Partnership.  Under the Partnership Agreement, however, AMTAX's consent to any sale is required, and AMTAX never provided that consent.

100.     Accordingly, the GP Affiliate's Unauthorized Right of First Refusal could not have been and was not validly triggered or exercised.

101.     The General Partner's actions toward Plaintiffs constituted self-dealing that was inconsistent with the General Partner's fiduciary duties to its partners, because, among other reasons, it sought to deprive Plaintiffs of the benefit of their bargain with the General Partner in an improper effort to benefit the GP Affiliate.

## I.  Defendants' Proffered Interpretation of the Unauthorized Right of First Refusal Jeopardizes the Project's Tax Benefits.

102.     Defendants interpret the Unauthorized Right of First Refusal to permit the General Partner to unilaterally trigger the Unauthorized Right of First Refusal merely by soliciting offers for the Apartment Complex, even if AMTAX does not consent and even if AMTAX and/or the Partnership are not willing sellers.

103.     Defendants also contend that the GP Affiliate may exercise the Unauthorized Right of First Refusal without AMTAX's consent to a sale of the Apartment Complex.

104.     In other words, Defendants effectively interpret the Unauthorized Right of First as a self-triggering option, rather than a defensive right of first refusal.  Contrary to standard principles of contract interpretation, Defendants' interpretation would render superfluous and meaningless both the GP Affiliate's separate option right under the Unauthorized Right of First Refusal *and* the General Partner's Option and General Partner's ROFR under the Partnership Agreement.

105.     In addition, if the Unauthorized Right of First Refusal were instead a below-market option (which it is not), then it would not comply with Section 42 of the Internal Revenue Code and thus would jeopardize the tax benefits that have been and will be realized by Plaintiffs.

**J.**      **The City Purports to Exercise Boston's Option.**

106.    On February 24, 2020, the City responded to the December 20, 2019 Notice to Boston of Proposed Sale.  In its response, the City purported to exercise Boston's Option.

107.    A week later, on March 3, 2020, the General Partner informed Plaintiffs of the City's purported exercise of Boston's Option.

108.    The City's purported exercise of Boston's Option is invalid, ineffective, void, and/or void *ab initio* for at least two reasons.

109.    First, Boston's Option can only be exercised upon delivery by the Partnership of a "notice of intent to sell."

110.    Accordingly, it is a condition precedent to the exercise of Boston's Option that the Partnership have a then-present intent to sell the Apartment Complex.

111.    The Partnership did not have a then-present intent to sell because it had not obtained the consent of AMTAX to sell the Apartment Complex, which is expressly required under the Partnership Agreement.

112.    The Notice to Boston of Proposed Sale was sent before the Partnership had received any offers to purchase the Apartment Complex, and the Partnership could not have an intent to sell without either a purchaser or a sales price.

113.    Second, the Affordable Housing Covenant pursuant to which the Notice to Boston of Proposed Sale was sent requires that "[a]ll notices . . . required . . . under [it] shall be . . . signed by a duly authorized officer or agent . . .."

114.    Because the General Partner was not authorized to execute or send the Notice to Boston of Proposed Sale, the Notice to Boston of Proposed Sale did not satisfy a necessary condition precedent to the exercise of Boston's Option.

**COUNT I**
**(Declaratory Judgment - Against Defendants – The Unauthorized Right of First Refusal is**
**Void and Inconsistent with Section 42 of the Internal Revenue Code)**

115.    Plaintiffs incorporate by reference each of the preceding paragraphs and the allegations of the Counts below as though fully set forth herein.

116.    This case constitutes an actual controversy within the jurisdiction of this Court because it involves the interpretation of Section 42 of the Internal Revenue Code.

117.    The General Partner caused the Partnership to enter into the Unauthorized Right of First Refusal with the GP Affiliate without the knowledge of the Partnership's limited partners, including Plaintiffs.

118.    The Unauthorized Right of First Refusal is void and violated Section 42 of the Internal Revenue Code for at least the following reasons:

a.    the Unauthorized Right of First Refusal grants a 'carve-out' for indebtedness incurred by the Sponsor which is not permitted by, and violates, Section 42 of the Internal Revenue Code;

b.    the rights under the Unauthorized Right of First Refusal commence years prior to when such rights are permitted under Section 42 of the Internal Revenue Code, and the Unauthorized Right of First Refusal thus violates the Internal Revenue Code;

c.    entering into the Unauthorized Right of First Refusal materially breached the Partnership Agreement, the Representation Certificate, and the General Partner's fiduciary duties to the Partnership and to the limited partners;

d.    the Unauthorized Right of First Refusal lacked consideration;

e.    the General Partner's execution of the Unauthorized Right of First Refusal was without authority and *ultra vires*;

f.      The General Partner did not have authority to cause the Partnership to enter into the Unauthorized Right of First Refusal without the agreement of AMTAX, which AMTAX did not provide;

g.      the General Partner "ha[s] no authority to perform any act . . . in violation of . . . any applicable law or regulation[,]" Partnership Agreement § 7.1(A), but the purchase price under the Unauthorized Right of First Refusal does not comply with the price requirements for a right of first refusal under Section 42(i)(7) of the Internal Revenue Code;

h.      to the extent the Unauthorized Right of First Refusal grants a below-market option, as Defendants contend, then it does not comply with Section 42 of the Internal Revenue Code; and

i.      the Unauthorized Right of First Refusal is the product of fraud.

119.    Defendants were aware of each of the foregoing facts at all relevant times.

120.    Accordingly, Plaintiffs seek a declaratory judgment that the Unauthorized Right of First Refusal violates Section 42 of the Internal Revenue Code, is void, void *ab initio*, and/or otherwise ineffective, does not effectively grant any rights to Defendants, and could not have been and was not validly exercised.

121.    In the alternative, in the event the Court determines that the Unauthorized Right of First Refusal is valid, Plaintiffs seek a declaratory judgment that the GP Affiliate's effort to exercise the Unauthorized Right of First Refusal in the absence of a bona fide third party offer that AMTAX consents to accepting constitutes an unlawful attempt to convert the Unauthorized Right of First Refusal into a unilateral below-market option in violation of Section 42 of the Internal Revenue Code, and thus is invalid and unenforceable.

## COUNT II
**(Declaratory Judgment – Against Defendants – The Disposition Notice, Purchase Notice, and Purported Exercise of the Unauthorized Right of First Refusal Are Invalid and Void)**

122.     Plaintiffs incorporate by reference each of the preceding paragraphs and the allegations of the Counts below as though fully set forth herein.

123.     The Unauthorized Right of First Refusal purports to grant the GP Affiliate a below-market right of first refusal to purchase the Apartment Complex, "in the event [the Partnership] proposes to sell" its "interest therein."

124.     The Partnership Agreement requires AMTAX's consent to any proposed sale of the Apartment Complex for the sale to be binding on the Partnership.

125.     AMTAX never consented to any sale of the Apartment Complex. Accordingly, a condition precedent to the sale of the Apartment Complex was not satisfied, and the General Partner did not have the authority to sell the Apartment Complex.

126.     Plaintiffs, who own 99.991 percent of the partnership interests in the Partnership, do not want the Apartment Complex to be sold.  Such a sale would not protect or advance their interests or the interests of the Partnership, and the General Partner cannot sell the Apartment Complex under such circumstances.

127.     The Partnership accordingly did not and could not "propose to sell" the Apartment Complex to anyone, and the General Partner thus had no basis or authority to issue the Disposition Notice.

128.     The Disposition Notice was *ultra vires*, void, void *ab initio*, and/or otherwise ineffective.

129.     Because the Disposition Notice was improperly sent by the General Partner purportedly on behalf of the Partnership, the conditions that must be satisfied to trigger the

Unauthorized Right of First Refusal have not occurred, the Unauthorized Right of First Refusal was not validly triggered or exercised, and the Purchase Notice was not validly sent.

130.    Plaintiffs seek a declaratory judgment that the Disposition Notice, Purchase Notice, and the purported exercise by the GP Affiliate of the Unauthorized Right of First Refusal were void, void *ab initio*, and/or otherwise ineffective, and that the Partnership has no obligation to sell the Apartment Complex to the GP Affiliate.

### COUNT III
### (Declaratory Judgment - Against Defendants – The General Partner's Notice to Boston of Proposed Sale is Invalid and Void)

131.    Plaintiffs incorporate by reference each of the preceding paragraphs and the allegations of the Counts below as though fully set forth herein.

132.    Plaintiffs seek a declaratory judgment that the Notice to Boston of Proposed Sale issued by the General Partner purportedly on behalf of the Partnership to the City is void, void *ab initio*, and/or otherwise ineffective on the grounds identified herein.

### COUNT IV (Alleged in the Alternative)
### (Declaratory Judgment – Against Defendants – Assuming *Arguendo* the Purported Exercise of the Unauthorized Right of First Refusal is Valid, Plaintiffs are Entitled to an Exit Tax Distribution)

133.    Plaintiffs incorporate by reference each of the preceding paragraphs and the allegations of the Counts below as though fully set forth herein.

134.    Under the Unauthorized Right of First Refusal and Section 42 of the Internal Revenue Code, the GP Affiliate is required to pay a purchase price equal to the amount of outstanding debt secured by the Apartment Complex plus any taxes that would result from the sale.

135.    On at least two occasions, the General Partner admitted that a sale of the Apartment Complex would result in millions of dollars in exit taxes to Plaintiffs.

136.    Despite those admissions, the purchase price set forth in the Purchase Notice did not include any Exit Tax Distribution or any other amount sufficient to reimburse AMTAX for taxes associated with the sale, contrary to the terms of the Unauthorized Right of First Refusal and the terms of the safe harbor provisions of Section 42 of the Internal Revenue Code.

137.    Plaintiffs seek a declaratory judgment that Plaintiffs are entitled to receive an Exit Tax Distribution, or any other amount sufficient to reimburse AMTAX for taxes associated with the sale, in addition to any other amounts required under the Unauthorized Right of First Refusal and Section 42 of the Internal Revenue Code if the GP Affiliate is permitted to exercise the Unauthorized Right of First Refusal (which it should not be).  A calculation of such amount would include the tax rate applied by and agreed to by the General Partner in the Disposition Notice (29%) applied to AMTAX's negative capital account balances, consistent with the accountants' analysis agreed to by the General Partner and presented to AMTAX in the General Partner's February 2017 and April 2019 offer letters.

## COUNT V
### (Fraud – Against Defendants)

138.    Plaintiffs incorporate by reference each of the preceding paragraphs and the allegations of the Counts below as though fully set forth herein.

139.    Upon information and belief, Defendants knew they had no legal right to cause the execution, for their own benefit and to the detriment of AMTAX and the Partnership, of the Unauthorized Right of First Refusal without AMTAX's knowledge or consent.

140.    Upon information and belief, Defendants knew the Unauthorized Right of First Refusal was executed without AMTAX's knowledge or consent in violation of the Partnership Agreement, was not in compliance with the statutory protections of Section 42 of the Internal Revenue Code, and was in breach of the General Partner's fiduciary duties, as described herein.

141.     Upon information and belief, the General Partner caused the Partnership to enter into the Unauthorized Right of First Refusal with the GP Affiliate without the knowledge of the limited partners.

142.     Upon information and belief, Defendants knew Plaintiffs were unaware of and did not agree to entering into the Unauthorized Right of First Refusal at the time it was executed.

143.     The General Partner had a duty to disclose the Unauthorized Right of First Refusal to Plaintiffs.

144.     Upon information and belief, the General Partner failed to disclose the existence of the Unauthorized Right of First Refusal to Plaintiffs at all relevant times.

145.     Upon information and belief, the GP Affiliate was aware of the General Partner's duty to disclose and that the General Partner had not fulfilled that duty.

146.     The General Partner affirmatively misled Plaintiffs to believe that the only operative purchase rights were the General Partner's Option and General Partner's ROFR that were included in the parties' Partnership Agreement and that there was no separate, other purchase right.

147.     Upon information and belief, the General Partner omitted and failed to disclose the existence of the Unauthorized Right of First Refusal to Plaintiffs and affirmatively misled Plaintiffs with the intent to deceive Plaintiffs into believing there was no Unauthorized Right of First Refusal.

148.     The General Partner also affirmatively misled Plaintiffs through the representations in the Representation Certificate that there were no charges and/or encumbrances on Plaintiffs' limited partner interests in the Partnership or the Apartment Complex other than those set forth in the Partnership Agreement.   The representations in the Representation Certificate were false

because the Unauthorized Right of First Refusal was such a charge and/or encumbrance and was not set forth in the Partnership Agreement.  The General Partner made that false representation with the intent to deceive Plaintiffs into making a substantial capital contribution to the Partnership.

149.    The fact that there were no other purchase rights beyond what was disclosed in the Partnership Agreement, as confirmed in the Representation Certificate, was basic to, material to, and went to the essence of the transaction contemplated by the Partnership Agreement, and Defendants knew or should have known that.

150.    Plaintiffs would not have consented to the Unauthorized Right of First Refusal because it did not comply with Section 42 of the Internal Revenue Code, and Defendants knew or should have known that.

151.    Defendants' omission of the existence of the Unauthorized Right of First Refusal, the parties' course of dealing and course of conduct before Plaintiffs discovered the existence of the Unauthorized Right of First Refusal, and the General Partner's affirmatively misleading representations and actions were reasonably relied upon by Plaintiffs and were material to Plaintiffs' negotiation of the terms of the Partnership Agreement, execution of the Partnership Agreement, and decision to join the Partnership, as well as their later conduct and decisions, as described herein.

152.    The GP Affiliate substantially assisted and was essential to the above-described scheme.  The fraud could not have been completed without the GP Affiliate executing the Unauthorized Right of First Refusal, and the GP Affiliate executed the Unauthorized Right of First Refusal with full knowledge that doing so defrauded Plaintiffs.

153.    Plaintiffs have been damaged as a direct and proximate result of Defendants' fraud.

154.    The Unauthorized Right of First Refusal was obtained by fraud and should be declared void.

155.    The precise dollar amount of Plaintiffs' damages will be proven at trial, but it is expected to exceed $34,400,000.

## COUNT VI
### (Breach of Contract – Against the General Partner for Breach of the Partnership Agreement)

156.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

157.    The Partnership Agreement is a valid, binding contract between the General Partner and Plaintiffs.

158.    Plaintiffs were and are ready, willing, and able to perform their duties and obligations under the Partnership Agreement and have performed all such duties such that they are entitled to performance by the General Partner of its duties and obligations under the contract.

159.    By entering into the Unauthorized Right of First Refusal, the General Partner materially breached the Partnership Agreement, as described herein.

160.    The Unauthorized Right of First Refusal violated numerous provisions of the Partnership Agreement by virtue of its non-compliance with Section 42 of the Internal Revenue Code, among other reasons as set forth herein, and was executed without Plaintiffs' knowledge or consent.

161.    The General Partner materially breached the Partnership Agreement by continuing to market the Apartment Complex after AMTAX rescinded its instruction to market the Apartment Complex, informed the General Partner that it no longer wished to sell the Apartment Complex, and informed the General Partner that it would not consent to any offers to purchase the Apartment Complex.

162.     The General Partner further materially breached the Partnership Agreement by sending a Disposition Notice to the GP Affiliate stating that the Partnership intended to sell the Apartment Complex and that the GP Affiliate had 30 days to exercise its right of first refusal to purchase the Apartment Complex at the below-market price set forth in the Unauthorized Right of First Refusal.  As a direct and proximate result of those material breaches of the Partnership Agreement, the GP Affiliate purported to exercise the Unauthorized Right of First Refusal to purchase the Apartment Complex at a below-market price for its own benefit and to the detriment of Plaintiffs and the Partnership.

163.     The General Partner further materially breached the Partnership Agreement by sending the Notice to Boston of Proposed Sale to the City.  The General Partner was not authorized to send the Notice to Boston of Proposed Sale, as the Partnership did not have a then-present intent to sell the Apartment Complex.  As a direct and proximate result of this material breach of the Partnership Agreement, the City purported to exercise Boston's Option to purchase the Apartment Complex at a below-market price, to the detriment of Plaintiffs and the Partnership.

164.     Plaintiffs have been damaged as a direct and proximate result of the General Partner's material breaches of the Partnership Agreement.

165.     The Unauthorized Right of First Refusal prevents the sale of the Apartment Complex to a third party for fair market value and prevents Plaintiffs from realizing the benefits of such a sale and other benefits of their bargain.

166.     Sending the Disposition Notice caused the GP Affiliate to purport to exercise the Unauthorized Right of First Refusal to purchase the Apartment Complex at a below-market price, which if permitted would prevent the sale of the Apartment Complex to a third party for fair market

value and prevent Plaintiffs from realizing the benefits of such a sale and other benefits of their bargain.

167.     Sending the Notice to Boston of Proposed Sale caused the City to purport to exercise a right of first refusal to purchase the Apartment Complex at a below-market price, which damaged Plaintiffs by preventing the sale of the Apartment Complex to a third party for fair market value and preventing Plaintiffs from realizing the benefits of such a sale and other benefits of their bargain.

168.     The precise dollar amount of Plaintiffs' damages will be proven at trial, but it is expected to exceed $34,400,000.

## COUNT VII
### (Breach of Contract – Against the General Partner for Breach of the Representation Certificate)

169.     Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

170.     The Representation Certificate is a valid, binding contract between the General Partner and AMTAX.

171.     The Representation Certificate provides that each of the representations contained therein "constitutes a material representation to be relied upon by [AMTAX] in respect to the [Partnership] and [AMTAX's purchase of the limited partnership interests in and contribution of capital to the Partnership]," and that "all such representations, covenants, and warranties will survive, and not be merged into, the Partnership Agreement."

172.     AMTAX fully performed its duties and obligations under the Representation Certificate such that it is entitled to performance by the General Partner of its duties and obligations under the contract.

173.    By entering into the Unauthorized Right of First Refusal, the General Partner materially breached the Representation Certificate, as described herein.

174.    The Representation Certificate is an enforceable promise by the General Partner that AMTAX would receive limited partner interests in the Partnership that were free and clear of any charge or encumbrance "except as specifically set forth in the Partnership Agreement."

175.    The Unauthorized Right of First Refusal constitutes a charge and/or encumbrance on AMTAX's limited partner interests in the Partnership.

176.    The Unauthorized Right of First Refusal was not "specifically set forth in the Partnership Agreement" or otherwise disclosed to Plaintiffs at the time AMTAX was admitted to the Partnership.

177.    Among other breaches, the General Partner also has failed to comply with, and therefore has breached, Section 4 of the Representation Certificate by failing to protect the interests of AMTAX; Section 23 of the Representation Certificate by failing to ensure delivery of tax credits; and Section 24 of the Representation Certificate by failing to ensure compliance with Section 42 of the Internal Revenue Code.

178.    Plaintiffs have been damaged as a direct and proximate result of the General Partner's material breaches of the Representation Certificate.  Specifically, Plaintiffs have been prevented from obtaining the bargained-for value of their limited partner interests in the Partnership.

179.    The precise dollar amount of Plaintiffs' damages will be proven at trial, but it is expected to exceed $34,400,000.

## COUNT VIII
### (Tortious Interference with Contract – Against the GP Affiliate)

180.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

181.    The GP Affiliate tortiously interfered with the performance of rights, duties, and obligations under the Partnership Agreement by executing the Unauthorized Right of First Refusal.

182.    The Partnership Agreement is a valid, binding contract between the General Partner and Plaintiffs which contemplated economic benefits to Plaintiffs.

183.    The General Partner is a wholly owned subsidiary of the GP Affiliate, and the GP Affiliate was aware of the Partnership Agreement and its terms and was aware that it was a valid and binding contract between the General Partner and Plaintiffs.

184.    The GP Affiliate knew, or should have known, that executing the Unauthorized Right of First Refusal would materially breach the Partnership Agreement in the ways described herein.

185.    The GP Affiliate knew, or should have known, that executing the Unauthorized Right of First Refusal would breach the General Partner's fiduciary duties to the Partnership and the limited partners, as described herein.

186.    Upon information and belief, the GP Affiliate knew that the limited partners were unaware of and had not consented to the Unauthorized Right of First Refusal and that their consent was required before the Partnership could enter into such an agreement.

187.    The GP Affiliate entered into the Unauthorized Right of First Refusal for the improper purpose of obtaining the right to purchase the Apartment Complex at below fair market value.

188.    To the extent it is deemed to be effective, the Unauthorized Right of First Refusal took effect because the GP Affiliate executed it.

189.    The GP Affiliate further tortiously interfered with the performance of rights, duties, and obligations under the Partnership Agreement when it sent the Purchase Notice purporting to exercise the Unauthorized Right of First Refusal.

190.    The Unauthorized Right of First Refusal was invalid, the conditions necessary to trigger and exercise the Unauthorized Right of First Refusal did not occur, and the GP Affiliate knew the foregoing when it, in bad faith, sent the Purchase Notice for the improper purpose of obtaining the Apartment Complex at a below-market price.

191.    The GP Affiliate knew that AMTAX did not consent to a sale of the Apartment Complex, and that AMTAX's consent was a necessary prerequisite to any such sale, but nonetheless attempted to force the Partnership to sell the Apartment Complex to the GP Affiliate at a below-market price without AMTAX's consent, including by sending the Purchase Notice.

192.    The GP Affiliate further intentionally interfered with the performance of rights, duties, and obligations under the Partnership Agreement by causing the General Partner to take actions that breached the Partnership Agreement in an attempt to create conditions under which the GP Affiliate could acquire the Apartment Complex at a below-market price.

193.    At all relevant times, the GP Affiliate directed and controlled the actions of the General Partner, causing the General Partner to market the Apartment Complex, send the Disposition Notice, and otherwise materially breach the Partnership Agreement, all so that the GP Affiliate could acquire the Apartment Complex at below fair market value.

194.     The GP Affiliate further tortiously interfered with the performance of rights, duties, and obligations under the Partnership Agreement by co-signing and co-sending the Notice to Boston of Proposed Sale.

195.     The General Partner was not authorized to send the Notice to Boston of Proposed Sale, as the Partnership did not have a then-present intent to sell the Apartment Complex and sending the Notice to Boston of Proposed Sale would materially breach the Partnership Agreement, and the GP Affiliate was aware of the foregoing.

196.     Plaintiffs have been damaged as a direct and proximate result of the GP Affiliate's tortious interference with the performance of rights, duties, and obligations under the Partnership Agreement. The GP Affiliate's tortious interference has prevented the sale of the Apartment Complex to a third party for fair market value and prevented Plaintiffs from realizing the benefits of such a sale and other benefits of their bargain.

197.     The precise dollar amount of Plaintiffs' damages will be proven at trial, but it is expected to exceed $34,400,000.

## COUNT IX
### (Breach of Fiduciary Duties – Against the General Partner)

198.     Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

199.     As the general partner of the Partnership, the General Partner owes fiduciary duties to the limited partners of the Partnership (Plaintiffs) and owed such duties to Plaintiffs at all relevant times.

200.     Those fiduciary duties include duties of utmost loyalty and good faith and the obligation to avoid self-dealing.

201.     The General Partner breached its fiduciary duties to Plaintiffs by: (a) failing to disclose the existence of the Unauthorized Right of First Refusal to Plaintiffs; (b) concealing the existence of the Unauthorized Right of First Refusal from Plaintiffs; (c) committing the Partnership to the Unauthorized Right of First Refusal—which, if effective, would deprive Plaintiffs and the Partnership of the opportunity to benefit from any appreciation in the fair market value of the Apartment Complex; (d) seeking to effectuate a transaction that would result in the below-market sale of the Apartment Complex to an affiliate, including by sending the Disposition Notice and the Notice to Boston of Proposed Sale; and (e) seeking to obtain a purchase price for its affiliate that did not include an Exit Tax Distribution to Plaintiffs, contrary to the purported requirements of the Unauthorized Right of First Refusal, the safe-harbor provisions of Section 42 of the Internal Revenue Code, and its own prior admissions.

202.     The General Partner further breached its fiduciary duties to Plaintiffs by refusing to cease marketing the Apartment Complex after AMTAX—upon discovering the existence of the Unauthorized Right of First Refusal—rescinded the exercise of its rights under Section 7.4(K) of the Partnership Agreement and told the General Partner it no longer wished to sell the Apartment Complex and would not consent to any purchase offers that were solicited and obtained.

203.     The General Partner committed the foregoing acts in breach of its fiduciary duties for the purpose of enabling the GP Affiliate to acquire the Apartment Complex at a below-market price, thereby benefiting the General Partner and the GP Affiliate at the expense of Plaintiffs and the Partnership.

204.     Plaintiffs have been damaged as the direct and proximate result of General Partner's breaches of fiduciary duty.

205.     The precise dollar amount of Plaintiffs' damages will be proven at trial, but it is expected to exceed $34,400,000.

## COUNT X
### (Aiding and Abetting Breach of Fiduciary Duties – Against the GP Affiliate)

206.     Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

207.     The GP Affiliate knew that if the General Partner caused the Partnership to enter into the Unauthorized Right of First Refusal, it would breach the General Partner's fiduciary duties to Plaintiffs.  Nevertheless, the GP Affiliate entered into the Unauthorized Right of First Refusal.

208.     The GP Affiliate knew that if the General Partner failed to disclose the Unauthorized Right of First Refusal to Plaintiffs, it would breach the General Partner's fiduciary duties to Plaintiffs.   Nevertheless, the GP Affiliate agreed not to and did not disclose the Unauthorized Right of First Refusal to Plaintiffs.

209.     The GP Affiliate knew that the General Partner was breaching its fiduciary duties by continuing to market the Apartment Complex after Plaintiffs explicitly informed the General Partner that they were not willing to consent to any sale.  Nevertheless, the GP Affiliate was willing to accept offers for the Apartment Complex that the General Partner was not authorized to solicit or obtain as a valid basis to exercise the Unauthorized Right of First Refusal.

210.     The GP Affiliate knew the General Partner did not have the consent of the limited partners (Plaintiffs) to sell the Apartment Complex and that such consent was required before the Apartment Complex could be sold. Nevertheless, the GP Affiliate accepted the Disposition Notice as valid and sent the Purchase Notice in an attempt to force the Partnership to sell the Apartment Complex to the GP Affiliate for millions of dollars less than its fair market value.

211.    In addition, the GP Affiliate knew that sending the Notice to Boston of Proposed Sale would breach the General Partner's fiduciary duties.  Nevertheless, the GP Affiliate co-signed the Notice to Boston of Proposed Sale and encouraged it to be sent so the GP Affiliate could purchase the Apartment Complex at a below-market price.

212.    As such, the GP Affiliate actively participated in, substantially assisted, and affirmatively encouraged the General Partner's breaches of fiduciary duties.

213.    The GP Affiliate's actions were in bad faith.

214.    Plaintiffs have been damaged as a direct and proximate result of the General Partner's breaches of fiduciary duties and the GP Affiliate's aiding and abetting of those breaches of fiduciary duties.

215.    The precise dollar amount of Plaintiffs' damages will be proven at trial, but it is expected to exceed $34,400,000.

## COUNT XI
**(Vicarious Liability for Breach of Contract and Breach of Fiduciary Duties – Against the GP Affiliate)**

216.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

217.    At all relevant times, the GP Affiliate has been the sole owner and shareholder of the General Partner.

218.    At all relevant times, the GP Affiliate exercised active and pervasive control over the General Partner, as set forth herein, including but not limited to causing the General Partner to grant to the GP Affiliate the Unauthorized Right of First Refusal and by causing the General Partner to make material false statements and omissions to Plaintiffs about the existence of the Unauthorized Right of First Refusal.

219.     The relationship between the GP Affiliate and the General Partner has resulted in a fraudulent or injurious consequence to Plaintiffs. Plaintiffs have been prevented from obtaining the bargained-for value of their limited partner interests in the Partnership, as well as from obtaining the benefits of a sale of the Apartment Complex to a third party for fair market value.

220.     The GP Affiliate is jointly and severally liable for the General Partner's breach of the Partnership Agreement, breach of the Representation Certificate, and breach of its fiduciary duties to Plaintiffs and the Partnership.

221.     The precise dollar amount of Plaintiffs' damages will be proven at trial, but it is expected to exceed $34,400,000.

**COUNT XII**
**(Mass. Gen. Laws Ann. ch. 93A: Deceptive Acts in the Conduct of Commerce – Against Defendants)**

222.     Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

223.     Plaintiffs and the General Partner are engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A.

224.     The actions of the General Partner alleged herein, including but not limited to entering into the Unauthorized Right of First Refusal without informing Plaintiffs or obtaining their consent, failing to disclose the Unauthorized Right of First Refusal to Plaintiffs, refusing to cease marketing the Apartment Complex after Plaintiffs informed the General Partner they were not willing to sell the Apartment Complex, issuing an unauthorized Disposition Notice, and issuing the unauthorized Notice to Boston of Proposed Sale, constitute unfair and deceptive acts or practices in the conduct of trade or commerce pursuant to M.G.L. c. 93A.

225.     The actions of the GP Affiliate alleged herein, including but not limited to entering into the Unauthorized Right of First Refusal without informing Plaintiffs, deliberately encouraging

and participating in the General Partner's breaches of the Partnership Agreement and the breaches of fiduciary duties, accepting the unauthorized Disposition Notice and treating it as valid despite knowing it was unauthorized and not valid, purporting to exercise the Unauthorized Right of First Refusal, issuing the Purchase Notice, and co-signing and co-sending the Notice to Boston of Proposed Sale despite knowing it was unauthorized and not valid, constitute unfair and deceptive acts or practices in the conduct of trade or commerce pursuant to M.G.L. c. 93A.

226.    The unfair and deceptive practices of Defendants alleged herein occurred primarily and substantially within the Commonwealth of Massachusetts.

227.    Defendants performed the unfair and deceptive acts or practices alleged herein willfully and knowingly. Defendants knew their actions were unfair and deceptive and that they did not have the legal right to take those actions.

228.    Plaintiffs have suffered losses as a result of the unfair and deceptive acts or practices of Defendants, as described herein.

229.    The precise dollar amount of Plaintiffs' damages will be proven at trial, but it is expected to exceed $34,400,000.

230.    Plaintiffs respectfully submit that an award of treble damages and payment of their attorney's fees are appropriate in this case pursuant to the provisions of M.G.L. c. 93A.

WHEREFORE, Plaintiffs AMTAX Holdings 227, LLC and Tax Credit Holdings III, LLC respectfully request that the Court enter judgment in its favor and against Defendants, as follows:

a.    Count I: Enter a declaratory judgment that the Unauthorized Right of First Refusal does not comply with Section 42 of the Internal Revenue Code; and that the Unauthorized Right of First Refusal was void, void *ab initio*, and/or otherwise ineffective, did not effectively grant the

GP Affiliate any rights, and could not have been and was not validly exercised.  In the alternative, in the event the Court determines that the Unauthorized Right of First Refusal is valid, Plaintiffs seek a declaratory judgment that the GP Affiliate's effort to exercise the Unauthorized Right of First Refusal in the absence of a bona fide third party offer that AMTAX consents to accepting constitutes an unlawful attempt to convert the Unauthorized Right of First Refusal into a unilateral below-market option in violation of Section 42 of the Internal Revenue Code, and thus is invalid and unenforceable.

b.      Count II: Enter a declaratory judgment that the Disposition Notice, Purchase Notice, and purported exercise by the GP Affiliate of the Unauthorized Right of First Refusal under the Unauthorized Right of First Refusal were all void, void *ab initio*, and/or otherwise ineffective, and there is no obligation to sell the Apartment Complex to the GP Affiliate.

c.      Count III: Enter a declaratory judgment that the Notice to Boston of Proposed Sale issued by the General Partner purportedly on behalf of the Partnership to the City was void, void *ab initio*, and/or otherwise ineffective.

d.      Count IV: In the alternative, enter a declaratory judgment that Plaintiffs are entitled to receive an Exit Tax Distribution or other amount due to them upon the sale of the Apartment Complex as properly calculated and described herein, in addition to any other amounts required under the Unauthorized Right of First Refusal, if the GP Affiliate is permitted to exercise the Unauthorized Right of First Refusal (which it should not be).

e.      Count V: Enter judgment against Defendants and in favor of Plaintiffs voiding the Unauthorized Right of First Refusal based on Defendants' fraud and/or awarding money damages in an amount to be proven at trial.

       f.      Counts VI, VII and IX: Enter judgment against the General Partner for breach of contract and breach of fiduciary duties and award Plaintiffs money damages in an amount to be proven at trial.

       g.      Counts VIII and X: Enter judgment against the GP Affiliate for tortious interference with the Partnership Agreement and for aiding and abetting the General Partner's breaches of fiduciary duties and award Plaintiffs money damages in an amount to be proven at trial.

       h.      Count XI: Enter judgment against the GP Affiliate for joint and several liability for the General Partner's breaches of contract and breach of fiduciary duties (Counts VI, VII, and IX).

       i.      Count XII: Enter judgment against Defendants for violation of Mass. Gen. Laws ch. 93A, and awarding Plaintiffs money damages in treble the amount proven at trial.

       j.      Award Plaintiffs their reasonable attorney's fees and costs incurred in connection with this matter.

       k.      Award Plaintiffs interest on any award of money damages.

       l.      Award Plaintiffs such other and further relief as the Court deems just and proper.

Dated: May 12, 2020

Respectfully Submitted,

**NIXON PEABODY LLP**

By:    */s/ Stephen M. LaRose*
     Stephen M. LaRose (BBO # 654507)
     Christopher E. Queenin (BBO # 682636)
     Exchange Place
     53 State Street
     Boston, MA 02109
     Tel: 617-345-1000
     Fax: 617-345-1300
     slarose@nixonpeabody.com
     cqueenin@nixonpeabody.com

     and

     Louis E. Dolan, Jr.
     Brian P. Donnelly
     799 9th Street, N.W., Suite 500
     Washington, DC 20001
     Tel: 202-585-8818
     Fax: 866-947-3760
     ldolan@nixonpeabody.com
     bdonnelly@nixonpeabody.com
     *Pro Hac Vice Requests Forthcoming*

     *Counsel for Plaintiffs AMTAX Holdings*
     *227, LLC and Tax Credit Holdings III,*
     *LLC*